## LOWDEN et al. v. SIMONDS–SHIELDS–LONSDALE GRAIN CO.*

### No. 11047.

Circuit Court of Appeals, Eighth Circuit.

July 5, 1938.

*Rehearing denied Aug. 4, 1938.

Dean Wood and Hale Houts, both of Kansas City, Mo. (Luther Burns, of Topeka, Kan., and Henry S. Conrad, Charles M. Miller, Cyrus Crane, and George J. Mersereau, all of Kansas City, Mo., on the brief), for appellants.

M. W. Borders, Jr., of Kansas City, Mo., for appellee.

Before STONE, WOODROUGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This was an action brought by the appellants, hereinafter called "plaintiff-carrier", against the defendant, hereinafter called the "shipper", to recover for services in installing certain grain doors on the box cars in which grain in bulk was shipped in interstate commerce by the shipper.

The Court below found in favor of the shipper, and from the judgment, this appeal was taken.

The facts were largely stipulated, and, with headings and signatures omitted, are set out in the margin.[1]

WOODROUGH, Circuit Judge, dissenting.

Among them was a provision from a Freight Tariff, effective July 1, 1935. (See

[1] Stipulation and Agreed Statement of Facts.

"It is hereby stipulated and agreed, by and between the parties hereto, that a jury may be waived in the above entitled cause and the same submitted to the court on the following stipulated facts:

* * * *

"(3) It is further stipulated and agreed that plaintiffs duly filed with the Interstate Commerce Commission, and duly posted and published a certain Western Trunk Lines Freight Tariff No. 330, with respect to furnishing and installing grain doors, or lumber for side or end door barricades for carload shipments in bulk, of grain, grain products and other articles, at certain terminal elevator points specified in said Tariff, including Kansas City, Missouri-Kansas, and that the effective date of said Tariff was July 1st, 1935; that attached to this stipulation is a true and correct copy of said Tariff, marked 'Exhibit A', the parties hereto agreeing that the same may be offered in evidence and used with the same force and effect as though duly certified by the Interstate Commerce Commission. The particular part of said Tariff, applicable to this case, is designated as Item No. 70, on page 13 of said Tariff.

"(4) It is further stipulated and agreed that on July 2, 1935, following the effec-

Exhibit "A" at the end of the stipulated facts). Said clause reads as follows:

"(1). Grain Doors or Lumber for necessary side door barricades (also for necessary end door barricades, if car is equipped with end doors requiring such protection) for carload shipments in bulk, of grain, grain products, seeds and other articles taking same rates, as specified in Lists Nos. 1, 2, 3, 4, 5, 6, Items Nos. 200 to 270, inclusive, will be furnished at loading stations without charge, by the initial road-haul carrier. * * * The grain doors or lumber so furnished shall be installed by the shipper (or his agent) and at his expense. The railroad will act as shipper's agent and install grain doors at terminal elevator points specified below, at a charge

tive date of said Tariff on July 1, 1935, the defendant, along with many other shippers of grain and grain products from terminals in Kansas City, Missouri-Kansas, sent by mail a joint letter to the local freight agents of all railroads, including the plaintiffs, entering said terminals, to the general effect that the defendant, as a shipper of bulk grain, regardless of anything contained in the Tariff hereinbefore referred to, or any other rule or regulation filed with the Interstate Commerce Commission, or otherwise, and the other said shippers, signing such letter, would expect the plaintiffs and the other railroads to whom said joint letter was addressed, to continue from and after July 1, 1935, as before said date, to furnish and supply the defendant and the other said shippers, upon orders for cars to load and ship bulk grain, such equipment as would be suitable to carry such bulk grain safely, and that if ordinary box cars were furnished and supplied on said orders, the defendant and the other said shippers signing said letter would expect such cars to be fully coopered or prepared with necessary side-door barricades, completely installed and ready for loading, and that the defendant and said other shippers, regardless of the provisions of said Tariff, declined and would continue to decline to pay plaintiffs any charge demanded for the service of installing, or placing of grain doors or barricades in cars delivered by plaintiffs to the defendant, upon orders of the defendant, for the loading of bulk grain;

* * * *

(Quoted from letter of July 2, 1935). "The undersigned, being shippers of bulk grain located in Kansas City, Mo.-Kans., hereby notify you, and each of you, that regardless of anything contained in items Nos. 70 and 75 appearing on page 13 of a certain tariff filed for your account by L. E. Kipp, Agent, with the Interstate Commerce Commission under No. I. C. C. A-2579, or any other rule or regulation filed with the Interstate Commerce Commission or otherwise, they expect you to continue from and after July 1, 1935, as before said date, to furnish and supply them upon orders for cars to load and ship bulk grain such equipment for said purpose as is suitable safely to carry bulk grain.

4(a)
" 'Said undersigned parties further notify you that if ordinary box cars are furnished and supplied upon such orders they will expect them to be fully coopered or prepared with necessary side-door barricades completely installed and ready for loading.

" 'Said undersigned parties further notify you that regardless of the tariff items, or any other rules or regulations, they decline and will decline to pay any charges whatsoever which may be demanded by you for any work or service involved in making your cars suitable for loading bulk grain, and in particular they decline and will decline to pay any charge for the alleged service of installing or placing grain doors or barricades in cars tendered by you upon order for loading bulk grain.

" 'Said undersigned parties further notify you that if upon orders as aforesaid cars are furnished and supplied which are not fully coopered with grain doors or barricades in place or which are not otherwise suitable and properly prepared for loading bulk grain such cars will be accepted under protest, and protest is hereby made against each and every such car furnished or which may be furnished upon such orders.

" 'And said undersigned parties further notify you that if cars are furnished and supplied, contrary to this notice, which necessitate expenditure by said parties, or any of them, for labor or materials in order to install grain doors or barricades, or otherwise to make such cars suitable and properly prepared for loading bulk grain, then in that and every such event said parties will demand reimbursement in full together with interest for each and every such expenditure.'

* * * *

"On July 15, 1935, the local agent of plaintiffs, along with the local agents of the various other railroads entering Kansas City, Missouri-Kansas, sent to the defendant and other grain companies in Kansas City, Missouri-Kansas, in reply

of one dollar ($1.00) per car; *prior arrangements for the service to be made with the carriers and to cover a specified period of time: * * ***

"Kansas City......Mo.-Kan." [Italics ours.]

It is contended by the shipper that there was no prior arrangement made by it with the carrier.

It is contended by the carrier: First, that the shipper entered into a prior arrangement with the carrier; and, second,

---

to the letter quoted next above, the following joint letter:

\* \* \* \*

"'Gentlemen:—

"'In reply to your letter of July 2, 1935, relating to the installation of grain doors and other kindred matters, let me invite your attention to Item 70, as amended, and Item 75-A of the attached copy of W. T. L. Tariff No. 330 (L. E. Kipp's I. C. C. A-2579, H. B. Cummins' I. C. C. 372, J. E. Johanson's I. C. C. 2713, H. G. Toll's I. C. C. 1358) and Supplement No. 1 thereto.

"'It is believed that upon mature reflection you will agree with us that neither the shipper nor the railroad company can be party to a practice not in conformity with the provisions of the tariff as written.

"'In connection with your suggestion that you will demand reimbursement for grain doors or lumber installed at your expense, permit us to say that payment of such bills would be contrary to the provisions of the applicable tariff and therefore illegal. Bills of that character therefore cannot be recognized.

"'Unless therefore you make unqualified arrangements pursuant to the terms of the tariff it will be necessary to provide cars which do not have the grain doors installed although, of course, the carrier will provide grain doors or lumber as contemplated by the tariff. * * *'

"(5) It is further stipulated and agreed that between July 1, 1935, and February 29, 1936, plaintiffs, upon the orders of the defendant, placed at the defendant's elevator for loading by defendant with grain in bulk, a total of six hundred twenty-four (624) box cars, and that after said cars were placed for such loading and before they were loaded, plaintiffs, at their own cost and expense, furnished and installed the necessary grain doors in each of said 624 box cars, as alleged in plaintiffs' petition; that monthly during said period, plaintiffs rendered to the defendant bills of $1.00 for each of said cars in which grain doors were installed by plaintiffs during the month for which such bills were rendered; that on November 22, 1935, the defendant returned to plaintiffs' agent all bills theretofore rendered by plaintiffs to the defendant, with a letter declining to pay said bills, said letter being as follows:

"'November 22, 1935.

\* \* \* \*

"'We are returning you herewith bills for $1.00 per car charge for alleged service of installing grain doors in cars furnished at the Rock Island and Milwaukee Elevators loaded with bulk grain for transportation over the various lines issuing these bills.

"'There is no tariff authority for this charge unless it be Item No. 70 of W. T. L. Tariff 330, which item however provides in paragraph (1) that the railroad will act as the shipper's agent and install grain doors at terminal elevator points at a charge of $1.00 per car if prior arrangements for the service are made with the carriers covering specified period of time.

"'This tariff became effective on July 1st and we know of no change in the practice of furnishing and installing grain doors from that existing prior to July 1st, the carriers continuing to furnish upon orders for cars to transport bulk grain, cars completely equipped with grain doors and ready for use. We have made no arrangement with any carrier under which such carrier was to install the doors as our agent as contemplated by the tariff above referred to.

"'For this reason will you please advise tariff authority for these charges and if the bills were issued under authority of Item 70 W. T. L. Tariff 330 will you please advise how you arrived at the conclusion this item justifies the charge in the absence of any arrangement as contemplated by paragraph (1)?'

"That on January 9th, 1936, plaintiffs, through their agent, replied to the letter of the defendant quoted last above as follows:

\* \* \* \*

"'You request to be advised by what tariff authority these bills are presented and as to the arrangement made in connection with Paragraph 1 of Item 70 of W. T. L. tariff 330.

"'As to your first question, you are advised that these bills are rendered under the authority of W. T. L. freight tariff No. 330.

"'You are further advised that under date of July 2nd, 1935, you were a party to a joint letter to the railroads, in

that the shipper waived the tariff provision requiring prior arrangement because of its acceptance of the carrier's service in installing grain doors.

The clause relied upon by the carrier is contained in a letter, dated July 2, 1935, from the shipper, and reads as follows [See stipulated facts 4(a)]:

"Said undersigned parties further notify you that if ordinary box cars are furnished and supplied upon such orders they will expect them to be fully coopered or prepared with necessary side-door barricades completely installed and ready for loading."

This excerpt is taken from a letter written by the shipper to the local agents of the carriers. This excerpt gives rise to the principal questions in the case, viz.:

(1)   Was there a prior arrangement between the plaintiff-carrier and the shipper relative to the service of installing the grain doors?

(2)   Could such prior arrangement, if made, be waived by either party?

(3)   Was there any waiver made or attempted by either party?

(4)   Has the Interstate Commerce Commission exclusive jurisdiction to pass upon the question of existence of waiver?

Taking up the first question, we fail to find either in the findings of fact, conclusions of law, or in the transcript of evidence apart from these, anything which would support a finding of a "prior arrangement" between the parties. On the contrary, the correspondence found in the findings of fact makes it very clear that no such prior arrangement had been made.

The clause relied upon by plaintiff-carrier, above quoted, is immediately followed by three other clauses in the same letter

---

which was contained the following paragraph:

" ' "Said undersigned parties further notify you that if ordinary box cars are furnished and supplied upon such orders they will expect them to be fully coopered or prepared with necessary side door barricades completely installed and ready for loading."

" 'The Railroad Company in good faith accepted this notice that all cars ordered for grain loading were to be fully coopered as a prior arrangement made with the railroads, and, accepting such prior arrangement, the cars were coopered for your account and as your agent, and were accepted and used by you as such.

" 'This state of facts renders the tariff charges applicable.

" 'I present herewith bills for the services rendered; and request is hereby made that your check to cover be transmitted without delay.'

"That thereafter and on January 15, 1936, the defendant replied to plaintiffs' letter quoted last above as follows:

*   *   *   *

" 'Replying to your letter of January 9th, file 7968, and returning various bills for charges covering alleged service of installing grain doors in cars loaded with grain at the Milwaukee and Rock Island Elevators.

" 'We have noted all you have said and cannot agree with you that Mr. Scott's letter of July 2nd, under our signature could be construed as making a prior arrangement with the carriers for this service.

" 'As we stated in our letter of November 22nd, we have not made any arrangement with any carrier to perform this service in accord with the provisions of Item 70 W. T. L. tariff 330, which states this arrangement is to be made with the carriers and to cover a specified period of time.

" 'For this reason we decline to pay the bills and return them with this letter.'

*   *   *   *

"On March 30th, 1936, the local agent of plaintiffs, along with the local agents of the various other railroads entering Kansas City, Missouri-Kansas, sent to the defendant and other grain companies in Kansas City, Missouri-Kansas, in reply to the letter quoted next above, the following joint letter:

*   *   *   *

" 'Western Trunk Lines Tariff No. 330-A (Kipp's I. C. C. No. A-2653, Peel's I. C. C. No. 2779, Cummins' I. C. C. No. 388) Provides, subject to qualifications stated in Items 70 and 75 thereof, that in connection with carload shipments in bulk (subject to that tariff) of grain, grain products and other articles taking same rates, the necessary grain doors, or lumber in lieu thereof, shall be installed by the shipper (or his agent) and at his expense.

" 'Such installation contemplates the usual accessorial service in preparation of cars, such as inspection, a limited amount of cleaning and minor and inexpensive repairs required to prevent loss of grain by leakage.

" 'By Item 70 of the tariff, relative to shipments for road haul movement, it is provided that at the terminal elevator points specified in the item, the railroad

which remove any doubt about a "prior arrangement" having been made, even if the clause above quoted were ambiguous, which we think is not the case.

The trial Court in its Memorandum uses the following language:

"Cars were furnished by plaintiffs to defendant in the number stated. The plaintiffs did install grain doors on these cars and billed the defendant at the rate of one dollar per car. Not only, however, were 'no prior arrangements for the service' of installing the grain doors in question entered into by the plaintiffs and defendant, but the defendant positively and unequivocally refused to enter into such 'arrangements.'"

■■ The second and third questions may be treated together. They were so treated by the lower Court in its Memorandum. We quote the language used, even assuming that there was a prior arrangement.

"That the 'prior arrangements' condition of this tariff is (1) for the benefit of the carrier and (2) may be waived by the carrier was ruled by the majority of the Interstate Commerce Commission in Board of Trade et al. vs. Railway Co., et al., decided April 12, 1937. The reasoning supporting the first of these conclusions is not set out in the report. It seems to us that the conclusion is entirely arbitrary and altogether unsound.

"The $1 charge is unreasonably high; the Interstate Commerce Commission so ruled in the case cited. The plaintiffs now admit that in no event should they have judgment at a higher rate than 60 cents per

agent "will act as shipper's Agent and install grain doors at a charge of $1.00 per car; prior arrangements for the service to be made with the carriers and to cover a specified period of time."

* * * *

" 'In order that the tariff regulations may be strictly complied with, you will advise whether you elect to have carriers furnish cars with grain doors or lumber installed, or whether you elect to install grain doors or lumber for your own account.

" 'In the event you wish carrier to perform the installation service the period of time this arrangement shall be in force shall be specified.

" 'If you decline to enter into an arrangement, as provided by the tariff, or if you elect to install the grain doors or lumber for your own account, the carrier will furnish cars inspected and O.K.'d for grain loading, but without grain doors or lumber installed. * * '

"(6) It is further stipulated and agreed that the defendant returned to plaintiffs all bills rendered by plaintiffs to the defendant for the installation of grain doors in said 624 box cars, and wrote letters declining payment of the same and referring to defendant's letters to plaintiffs of November 22, 1935, and January 15, 1936, for defendant's reasons for its refusal to pay said bills.

"(7) It is further stipulated and agreed that each and all of said 624 box cars were loaded by the defendant with grain in bulk after plaintiffs installed the necessary grain doors in each of said cars, and that said 624 carload shipments in bulk, of grain, thereafter moved in due course from defendant's elevator in Kansas City, Missouri-Kansas, in interstate commerce, and that the loading point and unloading point of all said 624 carload shipments in bulk, of grain, were not within the same terminal or switching district.

"(8) It is further stipulated and agreed that plaintiffs have repeatedly demanded of the defendant payment for the installation of the said necessary grain doors in said 624 box cars, and each of them, and that the defendant has at all times refused, and still refuses, to pay for said service."

"Exhibit A", referred to in paragraph (3) of the Stipulation and Agreed Statement of Facts, reads in part as follows:

"Freight Tariff No. 330.

"Rules and Regulations—Continued.

"Item No. — Subject

"70 — Furnishing and Installing Grain Doors or Lumber for Side and End Door Barricades.

"(1) Grain Doors or Lumber for necessary side door barricades (also for necessary end door barricades, if car is equipped with end doors requiring such protection) for carload shipments in bulk, of grain, grain products, seeds and other articles taking same rates, as specified in Lists Nos. 1, 2, 3, 4, 5, 6, Items Nos. 200 to 270, inclusive, will be furnished at loading stations without charge, by the initial road-haul carrier. * * The grain doors or lumber so furnished shall be installed by the shipper (or his agent) and at his expense. The railroad will act as shipper's agent and install grain doors at terminal elevator points specified below, at a charge of one dollar ($1.00) per car; prior arrangements for the service to be made with the carriers and to cover a specified period of time: * * *

"Kansas City. . . . . Mo.-Kan."

car. Plaintiffs concede that the real value of the services rendered is not more than 60 cents. How can it be said that it is not, in part at least, for the benefit of the shipper that he shall have the right of election between himself installing a grain door (a 60-cent job) and paying another $1 for doing that job. Again, how can it be said that a choice as to whether 'the railroad will act as shipper's agent' vel non is of interest only to the railroad and of no interest whatever to the shipper?

"Not only do we not agree with the majority of the Interstate Commerce Commission in the case cited that the 'prior arrangements' condition of the tariff is for the sole benefit of the carrier, but we agree with the minority of that Commission that in no event can such a condition in a tariff be waived by either party. Davis v. Henderson, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182." (19 F.Supp. page 439.)

We agree with this conclusion of the lower Court.

In the Henderson Case, supra, a shipper of cattle sued the Railroad for failure to furnish a car within a reasonable time after notice. The defense was that the notice had not been given in writing as required by the tariff. Oral notice had been given by plaintiff to the station agent and accepted by him. The Supreme Court in its opinion said:

"The contention is that the rule was waived. It could not be. The transportation service to be performed was that of common carrier under published tariffs. The rule was a part of the tariff. Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co., 241 U.S. 190, 197, 36 S.Ct. 541, 60 L.Ed. 948; Missouri, Kansas & Texas Ry. Co. v. Ward, 244 U.S. 383, 388, 37 S.Ct. 617, 61 L.Ed. 1213; Davis v. Cornwell, 264 U.S. 560, 562, 44 S.Ct. 410, 68 L.Ed. 848."

See also Van Dusen Harrington Co. v. Northern Pacific Ry. Co., 8 Cir., 32 F.2d 466, and Northern Pac. Ry. Co. v. Van Dusen Harrington Co., 8 Cir., 60 F.2d 394; American Railway Express Company v. American Trust Co., 7 Cir., 47 F.2d 16.

Furthermore, the correspondence shows that neither the Railroad Company nor the shipper ever attempted to waive the requirement in question.

The fourth question remains: Does the Interstate Commerce Commission have exclusive jurisdiction of the matter of waiver to the exclusion of the Federal Courts?

The construction of a tariff is a matter of law for the courts unless technical words are employed which must first be given an interpretation by the Commission. Where words of a tariff have an ordinary meaning, the construction of such tariff, its effect and validity, is for the determination of the court. Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999; Butler Motor Co. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 272 F. 683.

We think the judgment should be

Affirmed.

It is so ordered.

WOODROUGH, Circuit Judge (dissenting).

The "arrangement" required by the tariff is for the shipper to let the railroad know before shipment which one as between the two of them is to perform the service in question and for how long. Nothing else. These shippers unequivocally indicated their expectation that the railroad would perform the service and fixed the time "from and after June 1, 1935." Their accompanying threat not to pay for the service was brutum fulmen—as though they had said they would not pay the freight on the goods they shipped, or demurrage. If the courts require them to pay, discrimination between those who have had the service and have paid for it and those who have had it without paying for it will be avoided. Discrimination is the evil and the courts should help, not hinder, doing away with it.